UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

CIVIL ACTION NO. 06-38

MIKE FITZPATRICK                                                    PLAINTIFF

v.                          **MEMORANDUM OPINION & ORDER**

CITY OF FRANKFORT, KENTUCKY and
WALLACE POSSICH, in his official and individual capacities          DEFENDANT

* * * * * * * * *

This matter is before the Court on the Motions for Summary Judgment filed by the

Defendants, City of Frankfort, Kentucky and Wallace Possich.

## I. Factual Background

This action is perhaps best described as the unfortunate culmination of a very difficult

working relationship.  Plaintiff Mike Fitzpatrick was employed by the Frankfort Fire Department

("Fire Department") from 1989 until May 31, 2006, when he retired**.**  Fitzpatrick Deposition,

Volume 1, p. 18; Fitzpatrick Response, p. 10.  He worked for the Fire Department as a

firefighter/paramedic, holding the rank of sergeant and serving as an EMT.  Fitzpatrick

Deposition, Volume 1, p. 105-09.  He also participated in and helped organize the Firefighter's

Local 1017, a firefighter's union that is not officially recognized by the City of Frankfort.  He

served as the union's president from 1997, when the union was first organized, to 2000.  Possich

Motion for Summary Judgment, p. 10, 19-20.

Defendant Wallace Possich is the Fire Chief for Defendant City of Frankfort.  He was

appointed Fire Chief in 1998.  Fitzpatrick and the union initially supported Possich's

appointment.  See *id.* at 19-20.  As Fire Chief, Possich was Fitzpatrick's highest superior within

the Fire Department.  *See* Exhibit S to Possich's Motion for Summary Judgment.

Upon reviewing the record, it appears that Fitzpatrick and the Defendants have had professional difficulties with one other for at least ten years prior to Fitzpatrick's retirement in 2006.  From 1996 on, Fitzpatrick brought numerous complaints to the Fire Department's attention challenging department policies and personnel matters, raising allegations of discrimination and preferential treatment of department employees,  critiquing the department's treatment of the firefighters' union, and advocating for greater inclusion of the civil service system in the department hierarchy.  These complaints were variously brought through official written grievances, problem resolution forms, and letters to officials of the Fire Department and the City of Frankfort, as well as through statements during department and union meetings.

Fitzpatrick's complaints, critiques, and other statements are central to the parties' allegations.  In August 1996, Fitzpatrick was informed that firefighters would need to undergo additional training and certification, for which they would be compensated.  Fitzpatrick initially refused to do this, claiming that it was not mandated and that he "never signed anything that says I have to be certified."  Exhibit A to Possich's Motion for Summary Judgment.  In October 1996, Fitzpatrick filed a grievance over the Fire Department's decision to change a minimum time requirement on a physical agility standard.  His superiors responded that the change was made to avoid age discrimination.  Exhibit B to Possich's Motion for Summary Judgment.  In a 1997 grievance, Fitzpatrick questioned policy decisions the Fire Department made regarding the physical fitness test and his job description, and argued against the changes here.  He complained of varying standards applying and said that he had been reprimanded for questioning possible discrimination by a supervisor, stating that "OVER INFLATED EGOS" were part of the

2

problem.  Exhibit C to Possich's Motion for Summary Judgment.  In 1999, Fitzpatrick became aware that other employees were not meeting their required monthly ride-time hours and had been involved in abusive conduct, and complained to Possich.  Dissatisfied with Possich's response, he re-grieved the matter in a letter to Possich, criticizing Possich's actions as unfair or preferential treatment.  Exhibit E to Possich's Motion for Summary Judgment.

Fitzpatrick also had several disputes with the Defendants over Fire Department positions.  Fitzpatrick says these disputes centered on his belief that the positions should have been filled with union members, or from the civil service, as ways of advancing these interests.  First was the position of EMS Director.  Fitzpatrick and several others, including Derron Rambo, applied for this position.  Fitzpatrick filed grievances and problem resolution forms over a selection process that he felt was unfairly skewed towards Rambo.  Exhibit G to Possich's Motion for Summary Judgment.  Fitzpatrick admitted that he never meant to accept the position, but applied only to maintain the position for a civil servant.  Possich's Motion for Summary Judgment, pp. 12-13.  Greg Moore, a union member at the time, was selected for the director's position.  *Id.* at 14.  Next were three EMS Shift Supervisor positions that Fitzpatrick believed should be filled by union members or from the civil service.  *See* Exhibit F to Possich's Motion for Summary Judgment; Possich's Motion for Summary Judgment, pp. 11-12; Fitzpatrick's Response, p. 4.  When the union failed to take what Fitzpatrick felt was necessary action on this position, he filed a grievance and attached his previous EMS Director grievance.  *Id.* at 12.  A union member obtained one of these positions.  *Id.*  The position of Emergency Preparedness Coordinator, held by Rambo, was also a source of dispute.  Fitzpatrick took issue with Rambo's fighting fires in this capacity, arguing that this was not in Rambo's job description, that there were safety issues if

3

Rambo had these responsibilities, and that the job should have been held by a civil service member.  Possich's Motion for Summary Judgment, pp. 14-17; Fitzpatrick's Response, p. 5. Fitzpatrick also believed that the Defendants wanted to remove the Assistant Fire Chief position from the ranks of the civil service, and voiced opposition to this possibility.  Fitzpatrick's Response, p. 4.  Fitzpatrick clarified his union and civil service motivations for these disputes in a letter sent to other union members.  Exhibit H to Possich's Motion for Summary Judgment.

Fitzpatrick, however, has also received his own share of complaints and criticisms.  In May 2006, shortly before his retirement, Fitzpatrick was reprimanded for what Possich says was "a series of absences from work."  Possich's Motion for Summary Judgment, p. 1.  When asked to explain these absences, Fitzpatrick merely responded that he had never had to explain them before and was not required to.  *Id.* at 1-2.  Fitzpatrick says this reprimand was personally delivered to his house by Possich and a police officer.  Fitzpatrick's Response, p. 9.  In January 2006, Fitzpatrick received a negative evaluation on his six-month performance review.  Exhibit L to Possich's Motion for Summary Judgment.  In September 2005, three firefighters filed a grievance complaining that Fitzpatrick was behind in his required ride-time hours and had not been required to complete them.  Exhibit R to Possich's Motion for Summary Judgment. Fitzpatrick had a harassment claim filed against him in 1999.  Exhibit G to Possich's Motion for Summary Judgment.  In 1996, Fitzpatrick received a written reprimand for using grievances to make serious, yet overly general allegations against department officers without factual evidence. Exhibit A to Possich's Motion for Summary Judgment.  Additionally, Fitzpatrick has received numerous critiques about having a negative and uncooperative attitude, being antagonistic towards officers and coworkers, and not respecting the chain of command.  *See* Exhibits A, E, G,

4

M, and O to Possich's Motion for Summary Judgment.

Fitzpatrick claims that the Defendants took several negative and unjustified actions against him towards the end of his tenure as a firefighter. Beginning in 2005, he says he began to experience a hostile work environment in which the "chain of command was manipulated" such that Fitzpatrick's supervisor, Lt. Travis, was transferred to a vacant position, and was replaced by another lieutenant named Ben Boggs, whom Fitzpatrick did not personally get along with. Fitzpatrick's Response, pp. 8-9. Apparently, this change of command was instituted contrary to standard protocol, and when Boggs arrived on the job, he stated that "I've been sent down here to straighten Mike Fitzpatrick out . . . and I've got the blessing of the Chief." *Id.* at 9. Later, in May 2006, Possich told Fitzpatrick that he would not be allowed to use any more vacation time for the rest of the year. Possich claimed that Fitzpatrick had been abusing the vacation policy earlier in the year by "burning vacation days" prior to his impending retirement. Although this contravened city policy, Possich admitted that several other employees had been allowed to do this. *Id.* Fitzpatrick also points to the series of reprimands issued to him in May 2006, and to deposition testimony of a fellow employee who described Fitzpatrick's work environment as "absolutely miserable" and a "witch hunt." *Id.* at 10. Fitzpatrick believes these actions were taken against him as punishment for his criticism of the Fire Department's decisions and his advocating for the union and the civil service.

Fitzpatrick asserts two types of claims against the Defendants. First, Fitzpatrick contends that the Defendants unconstitutionally retaliated against him in violation of the First Amendment and 42 U.S.C. § 1983. Fitzpatrick's Combined Response, p. 1-2. Second, Fitzpatrick contends that the Defendants constructively discharged him in violation of Kentucky state law. *Id.* at 2.

5

Fitzpatrick claims compensatory and punitive damages against both Defendants, as well as attorneys' fees and an injunction ordering Fitzpatrick's reinstatement and/or front pay. Complaint, p. 6.

## II. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment should be granted to the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering whether summary judgment is appropriate, the Court is to view the facts presented and all inferences therefrom in a light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

The initial burden is on the moving party to demonstrate the genuine absence of any issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), a burden which may be met by demonstrating the absence of evidence supporting an essential element of the non-movant's claim. *Id.* at 322-25. Once this initial burden is met by the movant, the burden of production is then shifted to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). To meet this shifted burden, the non-movant is required to go beyond its pleadings and previous allegations and present evidentiary material sufficient for a jury to reasonably find for the party. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, "a dispute over a material fact cannot be 'genuine' unless a reasonable jury could return a verdict for the nonmoving party." *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 248). Summary judgment must be entered

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.  Analysis

### A. 42 U.S.C. § 1983 Retaliation Claims

The thrust of Fitzpatrick's § 1983 claims is simple: punishment for the assertion of one's Constitutional rights.  Fitzpatrick claims that the Defendants retaliated against him in a variety of ways over the exercise of his First Amendment rights of free speech and association, namely, over his statements and criticisms about personnel decisions and policy issues at the Fire Department, and his defense of the union and the civil service.  To determine whether the Defendants are entitled to Summary Judgment on these First Amendment claims, the Court must apply a multi-factor test to the facts and allegations under consideration.  As stated in *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001):

> A plaintiff seeking to establish a case of retaliation for speech protected under the First Amendment must point to evidence sufficient to establish three elements: 1) the plaintiff engaged in constitutionally protected speech; 2) the plaintiff was subjected to adverse action or was deprived of some benefit; and 3) the protected speech was a "substantial" or "motivating factor" in the adverse action.

*Id.* (citing *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Though Fitzpatrick claims violations of his First Amendment rights of both free speech and free association (the latter over his union activities, *see* Fitzpatrick's Response, p. 5), it is clear that in the Sixth Circuit, claimed violations of these two rights are given the same analysis. "State employees' freedom of expressive association claims are analyzed under the same standard as state employees' freedom of speech claims."  *Akers v. McGinnis*, 352 F.3d 1030,

1036 (6th Cir. 2003). "Because the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause." *Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir. 1999). That being the case, the Court will jointly consider Fitzpatrick's claims over his free speech and free association rights in this section and under this analysis.

**1. Constitutionally Protected Speech/Association**

For Fitzpatrick's § 1983 claims to survive summary judgment, it must be determined whether any of his speech/association is entitled to Constitutional protection. *See Brandenburg*, 253 F.3d at 897. It is the responsibility of the Court to make this threshold determination of Constitutional protection. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 ("The inquiry into the protected status of speech is one of law, not of fact."); *see also Jacobellis v. Ohio*, 378 U.S. 184, 190 (1964) (In First Amendment free expression cases, "this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected."); *Pennekamp v. Florida*, 328 U.S. 331, 335 (1946) ("[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they . . . are of a character which the principles of the First Amendment . . . protect.").

The question of whether a claimant's/public employee's speech or association is protected by the First Amendment's free expression guarantees is governed by the Supreme Court's *Pickering* balancing test, as clarified in *Connick v. Myers*, 461 U.S. 138 (1983). Under the *Pickering* test, the plaintiff's/employee's rights of free speech are balanced against the

8

government/employer's rights of controlling its workplace.  "The problem . . . is to arrive at a balance between the interests of the [plaintiff/employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  In *Connick*, 461 U.S. 138, the Court explained that this *Pickering* balancing test requires a two-part inquiry for First Amendment retaliation claims, such as Fitzpatrick's.  First, the Court must decide whether the speech in question involves a "matter of public concern."  *Id.* at 146.  Second, if the speech qualifies as "a matter of public concern," the Court must determine whether the government's action against the claimant was justified, in light of the nature and content of the speech.  *Id.* at 149-55; *see also Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006):

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech.  The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.  If the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity has adequate justification for treating the employee differently from any other member of the general public.

*Id.* (citations removed).  Just as the Sixth Circuit has held that free speech and association claims are to be analyzed in the same fashion, it has also held that the *Pickering* balancing test applies to both these First Amendment freedoms.  "We perceive no logical reason for differentiating between speech and association in applying *Connick* to first amendment claims, and hold that it is so applicable."  *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985).

9

### a. Matter of Public Concern

For the speech at issue to enjoy constitutional protection such that a federal court can afford relief to a plaintiff, the speech must relate to a "matter of public concern." "[I]n order to merit *Pickering* balancing, a public employee's speech must touch on a matter of "public concern."  *City of San Diego v. Roe,* 543 U.S. 77, 82-83 (2004); *see Pickering*, 391 U.S. at 568 (public employees may not be "constitutionally compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest."); *see also Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003) ("[T]he employee must establish that his speech is protected.  To accomplish this, the employee must show that his speech touches on a matter of public concern, and demonstrate that his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer.") (citations removed).

If the speech cannot be said to involve a matter of public concern, and is better regarded as a purely private or personal matter to the plaintiff, then the government's retaliatory action is not subject to judicial oversight, and the plaintiff's claim must be dismissed.  *See Connick*, 461 U.S. at 146 ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."); *see also Garcetti*, 126 S. Ct. at 1958 (if the speech does not involve a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech").

10

An employee's speech regards a matter of public concern if it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146; *see also See v. City of Elyria*, 2007 U.S. App. LEXIS 22308, at *19 (6th Cir. 2007) ("In this Circuit, 'a matter of public concern usually involves a matter of political, social, or other concern to the community.'" (quoting *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir. 1999))).  Whether speech relates to a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 148.

It is axiomatic, however, that some forms of employee speech cannot satisfy this public concern requirement, meaning that for some actions taken against employees, there is no Constitutional redress.  *See Pickering*, 461 U.S. at 143 (reflecting that "government offices could not function if every employment decision became a constitutional matter").  In particular, where the employee's speech relates only to internal matters, personnel decisions, or matters of purely personal interest to the employee/speaker, then the speech cannot be characterized as relating to a matter of public concern.  *See id.* at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *see also Campbell v. Johns*, 1997 U.S. App. LEXIS 11887, at *10 (6th Cir. 1997) (Plaintiff's speech topics "relate to internal personnel disputes, are not of public concern, and therefore do not have First Amendment protection."); *Thomson v. Scheid*, 977 F.2d 1017, 1021 (6th Cir. 1992) ("[I]nternal office communication does not necessarily give rise to a

constitutional claim."). Mere dissatisfaction with a government employer's decisions does not

transform speech against those decisions into Constitutionally protected matters of public

concern. "[T]he First Amendment does not require a public office to be run as a roundtable for

employee complaints over internal office affairs." *Connick*, 461 U.S. at 149.

"Whether an employee's speech addresses a matter of public concern must be determined

by the content, form, and context of a given statement, as revealed by the whole record."

*Connick*, 461 U.S. at 147-48. This inquiry is driven primarily by what the "point," "focus,"

"content," or "communicative purpose" of the speech was. *Farhat v. Jopke*, 370 F.3d 580, 592

(6th Cir. 2004). The inquiry is not driven by the speaker's true intent behind his speech. "[O]ur

opinions are clear that, consistent with the "content" test of *Connick*, the pertinent question is not

*why* the employee spoke, but *what* he said." *Id.* at 591. "The inquiry into what a speaker intends

to communicate remains fundamentally different from an inquiry into why the speaker intends

that communication. The former inquiry is of much greater significance in determining whether

speech addresses a matter of public concern." *Id.* (quoting *Chappel v. Montgomery County Fire*

*Protection Dist. No. 1*, 131 F.3d 564, 574-75 (6th Cir. 1997).

The Supreme Court has made it clear that there is no requirement that *all* of the asserted

speech be entitled to Constitutional protection before a § 1983 violation can be found. *See*

*Connick*, 461 U.S. 138. If even one statement out of many is a matter of public concern, a

Constitutional claim may lie. Indeed, this was the case in *Connick* itself. There, the plaintiff was

fired for circulating a questionnaire to her co-workers in the District Attorney's office

questioning personnel-related decisions of the office. *Id.* at 140-42. Though only one of the

questions was found to touch on a matter of public concern, the Court proceeded to the next stage

12

of its analysis rather than dismissing the claim at the initial stage. *Id.* at 149-50. Thus, if any of Fitzpatrick's statements can be considered to touch on matters of public concern, this stage of the analysis is satisfied.

The parties' pleadings have documented Fitzpatrick's allegedly protected speech and association in great detail. The Complaint describes this speech/association as organizing the Frankfort firefighters into a union, and also in "speaking out against mismanagement and violations of Department Policy by Defendant Possich and others." Complaint, ¶ 10. Fitzpatrick asserts that all these statements and criticisms were made to advance the interests of his firefighter's union, to promote the expansion of the civil service system in the Fire Department, and to address public safety concerns that he perceived in certain practices. *See* Fitzpatrick's Reponse, pp. 2-7. The Defendants, however, assert that all these statements and criticisms are directed at department policies and personnel decisions, or are driven by purely personal concerns, and thus cannot be considered matters of public concern. *See* Possich's Motion for Summary Judgment. Further, to the extent Fitzpatrick's speech touches on union or civil service activism, the Defendants assert that this still does not make the speech a matter of public concern, since the City has discretion to recognize the union and classify certain positions as being in the civil service. *See id.* at 9, 15-17.

From the record, it appears that Fitzpatrick's speech advocating the expansion of the civil service or for public safety, as well as his association with the firefighters' union, touch on matters of public concern and are therefore entitled to Constitutional protection. Other statements or acts of Fitzpatrick that can only be classified as disagreements with policy or

13

personnel decisions for reasons unrelated to those above do not touch on matters of public concern and are not entitled to Constitutional protection.

There is authority in the Sixth Circuit suggesting that speech touting the interests of the civil service system is Constitutionally protected. In *Dotson v. Abramson*, 1995 U.S. App. LEXIS 615 (6th Cir. 1995), the plaintiff brought a § 1983 retaliation claim when he was demoted from his position as city police chief, allegedly over protected speech that he made. The Court assumed that the plaintiff's "alleged speech regarding maintaining the non-political character of the police chief position involved a matter of public concern." *Id.* at *13-14 (citing *Grossman v. Schwarz*, 678 F. Supp. 440, 447 (S.D.N.Y. 1988) (city law department attorney's speech against hiring of non-civil service attorneys involved matter of public concern)).

The Court also finds Fitzpatrick's references to *Meyers v. City of Cincinnati*, 934 F.2d 726 (6th Cir. 1991) and *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) helpful on this point. Both cases involved statements criticizing the city/defendant's implementation of an affirmative action policy. In analyzing the plaintiffs' § 1983 claims, both Courts held this to be protected speech, concluding that "'speech about a politically charged issue like affirmative action—whether pro or con—should be considered a matter of public concern.'" *Johnson*, 215 F.3d at 584-85 (quoting *Meyers*, 934 F.2d at 730). This Court finds criticism about the implementation of a city affirmative action similar in principle to criticism about the implementation of a city civil service system. Both are politically charged employment issues likely to be of immediate concern to employees like Fitzpatrick and employers like the Fire Department. If one topic is considered protected speech, so should the other.

14

Moreover, the Court agrees with Fitzpatrick that *AMFSCME, Local 1586 v. City of Paducah*, 471 S.W.2d 18 (Ky. 1971) is inapposite to the instant case. *AMFSCME* held that Kentucky law gives cities the right and discretion to classify certain employees within the civil service. *Id.* It does not follow from this, however, that criticism of the city's civil service decisions is therefore necessarily unprotected. By analogy, the President has the right and discretion to nominate people of his or her choice to government offices such as the Cabinet or the Supreme Court. Criticism of the President's nomination decisions is surely protected speech despite the discretionary nature of these decisions. The same holds true with the civil service system. Though it is not a clearly stated proposition that pro-civil service speech is protected speech, the Court concludes that this can be inferred from Sixth Circuit precedent.

Some of Fitzpatrick's speech can be fairly characterized as relating to advocacy for the expansion of the civil service system in the Fire Department's hiring. Fitzpatrick's voiced opposition to the removal of the Assistant Fire Chief from the civil service is an obvious example. Fitzpatrick stated that he drafted two letters addressing these concerns. Fitzpatrick Deposition, Volume 2, pp. 141-42. A letter Fitzpatrick sent to the union members confirms his interest in keeping the Assistant Chief position in the civil service. *See* Exhibit H to Possich's Motion for Summary Judgment. This letter appears to be contemporaneous with Fitzpatrick's opposition to the possible change in the Assistant Chief position.

As for Fitzpatrick's dispute with Possich over the Emergency Preparedness Coordinator position, the Court has located no contemporaneous documentation, such as grievance forms, submitted by Fitzpatrick stating his objections. As such, there is no way to assess the form and content of Fitzpatrick's objections to determine if they can be reasonably characterized as

15

relating to civil service concerns.  The afore-mentioned letter states that Fitzpatrick did make civil service arguments, and Fitzpatrick claims this in his deposition and pleadings.  Fitzpatrick Deposition, Volume 2, pp. 149-51.  Since the Court is to view all evidence in a light most favorable to the non-moving party on a summary judgment motion, it will be assumed for this section that Fitzpatrick's objections could be fairly characterized as relating to civil service concerns.

Fitzpatrick also claims that his fight with Possich over the EMS Director and EMS Shift Supervisor positions were based on civil service concerns.  *See* Fitzpatrick's Response, p. 4. However, Fitzpatrick's contemporaneous, written grievances over these matters do not support this claim.  For the EMS Director dispute, the documentation reveals that Fitzpatrick's concerns were primarily over the perceived bias in favor of Rambo specifically, not over the future of the position within the civil service.  *See* Exhibit G to Possich's Motion for Summary Judgment. There are only one or two isolated statements claiming that the position's interview process needs to be fair to all civil service employees; the rest of the nine-page grievance is concerned with Rambo's and Fitzpatrick's qualifications for the position.  *Id.*  "[A]n incidental reference to a public issue does not elevate a statement to a matter of public concern."  *Van Compernolle v. City of Zeeland*, 2007 U.S. App. LEXIS 16735, at *18 (6th Cir. 2007).  Similarly, for the EMS Shift Supervisor disagreement, Fitzpatrick's documentation only argues that the supervisor positions "are needed," and disputes Possich's determination that the positions are similar to existing positions in the Fire Department.  *See* Exhibit F to Possich's Motion for Summary Judgment.  There is no mention of the civil service at all in this documentation.  Fitzpatrick's underlying reason for these disputes may indeed have been the civil service, but this cannot be

16

objectively perceived from the grievances.  Subjective reasons do not dictate the nature of the allegedly protected speech.  *Chappel*, 131 F.3d 564.  This is not Constitutionally protected speech.

Fitzpatrick's speech that can be fairly characterized as relating to the promotion of public safety is also Constitutionally protected.  This is well-established in the courts of appeals.  *See Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002) ("When an institution oversees some aspect of public safety, the correct operation of that institution is a matter of public concern."); *see also Davis v. Allen Parish Serv. Dist.*, 210 Fed. Appx. 404 (5th Cir. 2006); *Eggleston v. Bieluch*, 203 Fed. Appx. 257 (11th Cir. 2006); *Schad v. Jones*, 415 F.3d 671 (7th Cir. 2005); *Ulrich v. City & County of San Francisco*, 308 F.3d 968 (9th Cir. 2002); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000).

Though Fitzpatrick claims that every issue he had with the Fire Department was related to either safety or the protection of firefighters' jobs, *see* Fitzpatrick Deposition, Volume 2, pp. 130-31, the only example of Fitzpatrick's speech that he specifically relates to safety concerns is that regarding the Emergency Preparedness Coordinator.  *See* Fitzpatrick's Response, p. 5.  His safety concern here was "over an individual who did not routinely train with a crew showing up at fires and participating in fire fighting duties."  *Id.*  Again, the Court finds no contemporaneous documentation of Fitzpatrick's grievances on this issue, so it is unclear whether this speech could be fairly characterized as relating to safety concerns, or if Fitzpatrick is merely discussing a subjective, but unstated, motive for the speech.  Viewing the evidence in a light most favorable to Fitzpatrick, the Court will assume that this speech was Constitutionally protected.

17

Fitzpatrick also argues that his speech and association are Constitutionally protected because they relate to union matters.  The Sixth Circuit has made clear, however, that "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law."  *Boals*, 775 F.2d at 692.  Alleging that the speech or association was intended to further union purposes is insufficient for the speech or association to merit Constitutional protection.  *See Van Compernolle*, 2007 U.S. App. LEXIS 16735, at *18 ("[Plaintiff's] argument that his union-related activities were matters of public concern because they were aimed at the purpose of a union—to provide a voice for his fellow officers in department operations—is also unpersuasive.").  For the speech in question to merit Constitutional protection, Fitzpatrick "must go beyond the fact that his statements and activities . . . occurred in a union context" and demonstrate that the speech touches on a matter of public concern.  *Id.*

Where Fitzpatrick's speech relates to union matters, it does so only in generally arguing for more fairness to union views and that more positions in the Fire Department should be reserved for union members.  In fact, the disputes regarding the EMS Shift Supervisor and Emergency Preparedness Coordinator did not address even these general concerns.  *See* Exhibits F (union issues never discussed) and G ("union" never once mentioned) to Possich's Motion for Summary Judgment.  Such speech does not appear to touch on matters of public concern apart from simply advocating in general for a stronger union presence in the Fire Department.  Situations where Fitzpatrick brought complaints or critiques to the Fire Department in his capacity as union president are similar—here, Fitzpatrick is only speaking about personnel or policy issues, which are not matters of public concern.  They do not become such matters simply

18

because Fitzpatrick is discussing them as a union officer rather than as a government employee. More is needed under Sixth Circuit precedent for this speech to be protected under the Constitution.

Although Fitzpatrick's union-related speech is not protected under these circumstances, his association, or membership, in the union is protected. The First Amendment protects the right of employees to organize together into labor unions. *See Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 464 (1979). The government has no obligation to listen, respond to, or even recognize the labor union, *id.* at 465, but it also cannot retaliate against an employee for exercising his right to associate with a union. *Id.* Similarly, though speech is not granted Constitutional protection solely by virtue of being union-related, *Boals*, 775 F.2d at 693, "[w]e have no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim under *Connick* and *Pickering*." *Id.*

Fitzpatrick's pleadings discuss his participation in and presidency of the union, as well as the union's participation in and importance to Fire Department affairs. *See* Fitzpatrick's Response, pp. 2-3. It is apparent that Fitzpatrick is claiming his association in this union as part of his protected association. *See id.*; *see also* Fitzpatrick Deposition, Volume II, pp. 130-31. This association is protected expression under the Constitution.

The Defendants repeatedly point out that the Firefighter's Local 1017 is not a union that is recognized by the City of Frankfort. The implicit argument is that because the union is unrecognized, Fitzpatrick's membership in it cannot be Constitutionally protected association. The Court does not find this argument convincing. The Defendants have presented no case law to the Court indicating that the official or unofficial character of a union determines the

Constitutional status of association with that union.  Since the union is not recognized by the City, the Fire Department need not bargain with it, *Smith*, 441 U.S. at 465, but this does not mean that an employee necessarily loses his or her right to associate in this union and avoid being punished for doing this.  Fitzpatrick's membership in the firefighters' union is Constitutionally protected association.

The remainder of Fitzparick's speech relates only to internal policy or personnel disputes unrelated to matters of public interest.  It is therefore unprotected by the Constitution.

**b. Government Justification**

Since at least some of Fitzpatrick's expression is Constitutionally protected, the Court must now determine whether the government actions Fitzpatrick complains of were nonetheless justifiable; i.e., whether the Defendants' interests in promoting the efficiency of their public services outweigh Fitzpatrick's interests in his protected speech.  *See Garcetti*, 126 S. Ct. at 1958; *Connick*, 461 U.S. at 149; *Pickering*, 391 U.S. at 568.  Just as with the issue of Constitutionally protected speech, the Court decides this balancing test as a matter of law.  *See Connick*, 461 U.S. at 150 n.10.  For the reasons explained below, the Court holds that the Defendants' actions were justified under these circumstances.

Under *Connick* and *Pickering*, once the plaintiff establishes that some or all of his speech is Constitutionally protected, the burden is shifted to the government to show adequate justification for its acts.  *See Connick*, 461 U.S. at 150.  There is no bright-line standard for the level of this burden, as it "varies depending upon the nature of the employee's expression."  *Id.* The greater the extent to which the employee's speech involved matters of public concern, the stronger is the showing of justification needed for the government to meet its burden.  *Id.* at 152.

Deciding whether the government has met this burden is the basic premise behind the *Pickering* balancing test.  *See Pickering*, 391 U.S. 563.  For the government to justify its actions against the employee, the employee's speech "must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers."  *Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991).

The courts have long acknowledged government employers' significant interests in taking action against employees whose speech, despite being Constitutionally protected, threatens the employers' operations.

> To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.  This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.  Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick*, 461 U.S. at 151.  This is especially so in government operations that have a particular impact on public safety.  "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."  *Id.* at 151-52.

Numerous courts have emphasized the importance of deference to the disciplinary actions of public safety entities, such as fire and police departments.  *See, e.g., Brown v. Trenton*, 867 F.2d 318, 322 (6th Cir. 1989) (police department; not reaching *Pickering* balancing step, but had it been reached, "the importance of deference to the city's judgment on the matter of discouraging public dissension within its safety forces would tip the scales decisively in favor of

the defendants"); *McMurphy v. City of Flushing*, 802 F.2d 191 (6th Cir. 1986) (emphasizing the importance of discipline to maintain very close working relationships in a small police department); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir. 1979) (fire department; "When lives may be at stake in a fire, an Esprit de corps is essential to the success of the joint endeavor.  Carping criticism and abrasive conduct have no place in a small organization that depends upon common loyalty 'harmony among coworkers.'" (citation removed)); *Paquette v. City of Mason*, 250 F. Supp. 2d 840, 845 (S.D. Ohio 2002) ("Effective fire department operations depend on esprit de corps, common loyalty, and comradeship, which are threatened when a firefighter undermines his supervisor's authority.").

The Defendants have focused their arguments extensively on this "esprit de corps," the significant need for employee loyalty and workplace harmony in a working environment where lives may be at stake, such as the Fire Department.  In such situations, a government superior such as Possich is not required to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships."  *Connick*, 461 U.S. at 154.  Fitzpatrick has an employment record that appears to reveal a generally antagonistic and uncooperative attitude towards his superiors and department policies, and that this attitude has been exhibited throughout his tenure at the Fire Department.  In order for the government's acts to be justified, it must demonstrate evidence that the Constitutionally protected speech or association itself created disharmony in the workplace or interfered with the functioning of the office, not merely that the employee's general attitude in other matters caused such problems.  *Meyers*, 934 F.2d at 730 (explaining that the Court is to "look for evidence of the impact of the statement on the [Defendant's] legitimate organizational interests."); *c.f. Marciariello v. Sumner*,

973 F.2d 295 (4th Cir. 1992) ("[W]e do not require the public employer to prove that the

employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably

to be apprehended.'" (citation omitted)).  This is a close case on this issue.  But, since in a fire

department "close working relationships are essential to fulfilling public responsibilities,"

*Connick*, 461 U.S. at 151-52, the Court must give "a wide degree of deference to the employer's

judgment." *Id.*  Therefore, the Court holds that the Defendants have sufficiently demonstrated

that Fitzpatrick's statements interfered with the functioning of the Defendants' organization.

      The record reflects the disruptive nature of Fitzpatrick's protected speech regarding the

appointment of Rambo to the Emergency Coordinator Position, as well as his advocating for

keeping the Assistant Chief position in the civil service.  As noted, the Court has found no

contemporaneous documentation illustrating Fitzpatrick's objections or grievances regarding

Rambo's appointment, but his deposition testimony indicates that he repeatedly re-raised and re-

argued this issue even after Possich had decided the matter.  *See* Fitzpatrick Deposition, Volume

2, pp. 150-56.  "[E]very single time that—in essence, all—the last major issues that we've had

seem to be a direct link to the fact that I was questioning something about Deron Rambo." *Id.* at

154.

> And I questioned it since the day that Deron Rambo first came into the picture
> outside the realm of part-time paramedic.  Every time I questioned it, every time
> that path was opened up for Deron Rambo to fill the position, I feel the
> chief—well, I know for a fact, I mean, he made numerous comments about, you
> know, leaving Deron Rambo alone, what's your problem with Deron Rambo,
> you're going to quit questioning Deron Rambo.

*Id.* at 154-55.  This apparent refusal to accept Possich's decision on Rambo's appointment is

evidence of an "impairment of discipline," and could reasonably be construed by Possich as an

attempt to undermine his authority.  *Connick*, 461 U.S. at 154.  This fear is corroborated by

Fitzpatrick's admission that he was getting other Fire Department employees to sign on to his dissension.  "I was bringing this stuff [the Rambo appointment] up in union meetings, and the union was agreeing with it."  Fitzpatrick Deposition, Volume 2, p. 154.

Fitzpatrick's speech relating to the Assistant Chief position, based upon its "content, form, and context," *Connick*, 461 U.S. at 147-48, also provides evidence of disruptive impact such that the Defendants' acts were justified.  Fitzpatrick expressed his views on this and other civil service matters in a letter that he placed in the work mailboxes of the union members.  *See* Exhibit H to Possich's Motion for Summary Judgment; Fitzpatrick Deposition, Volume 2, p. 139.  Much of the content and tone of this letter gives it the impression of a "call to arms" for union members to oppose personnel and policy decisions of the Fire Department, referring to such decisions as "assaults," and urging the union members to fight the Fire Department over them.  Significantly, Fitzpatrick refers to the Rambo appointment as something "we will not tolerate."  As for the Assistant Chief position, Fitzpatrick reveals that the Union "has sought legal advice to stop any process to eliminate the position of Assistant Chief."  Taking legal action to prevent a policy change is clearly disruptive action designed to undermine the Fire Department's actions.

Additionally, there is evidence that Fitzpatrick used his association with the union, which is otherwise protected speech under the First Amendment, to cause disruption of the kind discussed above.  In 1999, an incident involving firefighters Tucker and Leach was brought to Possich's attention by Fitzpatrick.  *See* Exhibit E to Possich's Motion for Summary Judgment. Possich resolved this through an official investigation, a series of meetings, and a memorandum to Fitzpatrick and other involved parties.  Fitzpatrick then re-grieved the matter to Possich,

24

specifically noting that he was doing this "as Union president," and that he disagreed with the way Possich handled it. *Id.* This re-questioning of a department decision undermines his supervisors' authority in the same way that his behavior towards the Rambo appointment does. Similarly, the "call to arms" letter just discussed above was a product of Fitzpatrick's association with the union, since it was distributed to all union members and urges these members to take action against the Fire Department. Finally, Fitzpatrick explained that "most of my questioning of Deron Rambo was through the union." Fitzpatrick Deposition, Volume 2, p. 156. Again, this is concrete evidence that Fitzpatrick was using his union association for disruptive purposes that would justify the Defendants' actions.

As the Defendants have satisfied their burden under the *Pickering* balancing test, the Court holds that no Constitutional violation was committed against Fitzpatrick. As such, the Court need not reach the issues of whether the second and third elements of Fitzpatrick's 42 U.S.C. § 1983 retaliation claims are satisfied. Summary judgment is therefore granted to the Defendants on Fitzpatrick's § 1983 retaliation claims.

## B. Constructive Discharge

Fitzpatrick also brings state-law claims of constructive discharge against the Defendants. Federal jurisdiction for these claims is apparently predicated on supplemental jurisdiction, 28 U.S.C. § 1367 ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). Since the Court has dismissed Fitzpatrick's § 1983 claims, the claims over which it had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over the remaining

25

state-law claim. *Id.* § (c)(3).  However, the Sixth Circuit has indicated that "'[w]hen all federal claims have been dismissed before trial, the best course is to remand the state law claims to the state court from which the case was removed,'" rather than dismissing the state-law claims. *Novak v. Metrohealth Medical Ctr.*, No. 06-3036, slip op. at 9 (6th Cir. Sept. 28, 2007) (quoting *Thurman v. Daimler Chrysler, Inc.*, 397 F.3d 352, 359 (6th Cir. 2004).  Fitzpatrick's constructive discharge claims are therefore remanded to the Franklin Circuit Court.

**WHEREFORE,** For the reasons stated above:

1.    Defendants Wallace Possich and City of Frankfort, Kentucky's Motions for Summary Judgment are **GRANTED.**  Plaintiff Mike Fitzpatrick's 42 U.S.C. § 1983 claims against the Defendants are **DISMISSED WITH PREJUDICE.**

2.    Plaintiff Mike Fitzpatrick's state-law constructive discharge claims against Defendants Wallace Possich and City of Frankfort, Kentucky are **REMANDED** to the Franklin Circuit Court.

Dated this 3rd day of October, 2007.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**

26